## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| THE TIMKEN COMPANY, | ) | Case No. 5:19-cv-00584 |
| | ) | |
| Plaintiff, | ) | Judge J. Philip Calabrese |
| | ) | |
| v. | ) | |
| | ) | |
| MTS SYSTEMS CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## OPINION AND ORDER

With a public partner, The Timken Company undertook a pioneering project to support the development of wind power.  At its heart, that project required the construction of a testing and development facility for ultra-large wind turbines.  To develop the key systems in that facility, Timken selected MTS Systems Corporation.  As relevant here, the parties entered into two contracts.  Then, as one would expect because they are now litigating in federal court, things went south.

Timken filed suit asserting claims for breach of contract, breach of warranty, fraudulent inducement, or, in the alternative, negligent misrepresentation.  MTS moves for summary judgment on all claims against it on the grounds that Timken's contract claims are time-barred as are its tort claims because they merge with the contract claims.  For its part, Timken moves for summary judgment on MTS's statute of limitations defense.  For the reasons that follow, the Court **GRANTS IN PART** and **DENIES IN PART** MTS's motion for summary judgment and **DENIES** Timken's motion for summary judgment.

## STATEMENT OF FACTS

Plaintiff The Timken Company manufactures ultra-large-wind-energy tapered roller bearings for wind turbines, among other products.  (ECF No. 43-1, ¶ 5, PageID #1248.)  Defendant MTS Systems Corporation designs and manufactures industrial testing and position sensors.  (ECF No. 35-1, ¶ 2, PageID #438.)  By way of background, Timken and Stark State College formed a joint venture to develop the Stark State College and The Timken Company Technology and Test Center, known as the Wind Center, where Timken could test products for use in wind-powered turbines and the college could train technicians to service them.  (ECF No. 35-3, PageID #450.)  This world-class facility was the first of its kind in the Americas and promised to shorten the time for product development while improving reliability and cost-effectiveness.  (ECF No. 41-4, PageID #1123–24.)

### A.     The Test System

Timken contracted with MTS to design and construct a bearing test system to allow Timken to "test the performance of its bearings in wind turbines at an accelerated rate," without having to wait years or decades to assess their performance in the field as customers used them."  (ECF No. 37-1, ¶ 12, PageID #907.)  Timken planned for the test system to run continuously (24 hours per day, seven days per week) to replicate the loads the bearings would experience in the field.  (*Id.*, ¶ 13.)  To provide a sense of the scale and scope of this project, the test system required a specially designed foundation at the Wind Center that was 13 feet deep and weighed approximately 1,000 tons.  (ECF No. 37-1; ¶ 36, PageID #913; ECF No. 43-1, ¶ 14, PageID #1249.)  Among the helpful images and diagrams the parties include in their

briefing, the following photo of the foundation under construction illustrates the scale of the project:



(ECF No. 37, PageID #890.)

To simulate the operations of a wind turbine, the test system consists of three main components:  (1) the NTL 5U (NTL stands for non-torque loading, and the U stands for upgradeable); (2) the reaction structure to which the test bearing is mounted; and (3) the foundation.  (ECF No. 35-1, ¶ 6, PageID #439; ECF No. 37-1, ¶ 15, PageID #908.)  One diagram the parties use helps identify these components:

3



(ECF No. 35, PageID #407; ECF No. 37, PageID #886.)

These components perform the following functions:

1.      Basically, the NTL 5U mimics the shaft of a wind turbine and recreates the forces that the wind turbine rotor blades would apply to the main shaft bearing in the field.  (ECF No. 37-1, ¶ 20, PageID #910.)  The NTL 5U is bolted to the bedplates that are anchored to the foundation, which MTS designed to Timken's specifications.  (Id., ¶ 22, PageID #911.)  This picture shows the NTL 5U being installed at the wind center:



([ECF No. 37](), PageID #888.)

2.    The reaction structure mimics the gear box in a wind turbine.  ([ECF No. 37-1](), ¶ 24, PageID #911.)  This structure attaches to Timken's tooling, which holds the test bearing in place.  (*Id.*)  It is also bolted to the foundation.  (*Id.*, ¶ 25.) This image depicts the basic operation of the gearbox:



(ECF No. 37, PageID #883.)

3.　　　Functioning as the test system's base, the foundation supports the NTL 5U and the reaction structure.  (ECF No. 37-1, ¶ 27.)  Also, the foundation must resist the forces generated during testing and dampen vibrations to protect the surrounding building and equipment at the Wind Center.  (*Id.*)

## B.　　**Quotes and Upgrade Options**

In June 2011, MTS provided Timken a quote for the NTL 5U that included a potential upgrade to the NTL 10.  (*See* ECF No. 36-5.)  That quote remained valid for one year.  (*Id.*, PageID #764.)  As quoted, upgrading to the NTL 10 involved increasing axial actuators and adding various hydraulic power supply and distribution components at a price of $650,000.  (*Id.*, PageID #776.)  Following negotiations between the parties, MTS provided Timken with a revised quotation, also in June 2011.  (ECF No. 36-6.)  In the revised quote, the components for an upgrade remained the same, but the price was $695,000.  (*Id.*, PageID #799.)  Based on the specifications in the quotation, the design for the frame could accommodate either the NTL 5U or the NTL 10.  (ECF No. 35-4, PageID #512; ECF No. 36-6, PageID #794.)

## C.　　**The Parties' Agreements**

Two purchase agreements govern various components of the system and lie at the heart of the parties' dispute.

### C.1.　　**Bilateral Purchase Agreement, July 1, 2011**

On July 1, 2011, Timken and MTS entered into a bilateral purchase agreement for the design, manufacture, testing, and commissioning at the Wind Center of an NTL 5U—the first of the components for the test system.  (ECF No. 35-5, PageID

#532.)  Under this contract, MTS agreed to design, manufacture, deliver, and test the system according to certain technical specifications for a fixed price of $3.49 million. (*Id.*, PageID #532–33.)  In addition to the NTL 5U module itself, Timken required that MTS supply a hydraulic power unit, recommend a gear box, motor, and motor drive for Timken to purchase, provide the electronics to run the NTL 5U, and integrate the NTL 5U and certain components.  (ECF No. 36-2, PageID #711.)

Instead of using standard terms of sale, the agreement provides a specific warranty and other terms.  (ECF No. 35-5, PageID #535.)  Of relevance to this dispute, MTS provided a warranty "for a period of twelve (12) months after Final Acceptance, which occurs after successful passing of acceptance test criteria at [the Wind Center] or not longer than eighteen (18) months after delivery to Point of Delivery, whichever occurs first."  (*Id.*)  This warranty covered the merchandise, defined in the agreement as "one (1) Wind Energy Ultra Large Bearing Test System (MTS Scope of Supply) for delivery and operation at the Wind [Center] . . . designed, built, delivered, tested and commissioned in accordance with" a technical specification incorporated into the contract.  (*Id.*, at PageID #532.)  Notwithstanding this definition of merchandise, the agreement's warranty extends to "goods and services."  (*Id.*, at PageID #535.)  It also provides that the "Merchandise shall perform in accordance with the requirements of the Purchase Order Documents and be fit for the use and purposes specified."  (*Id.*)  Further, the warranty for "Special Services including startup, commissioning, training and engineering services . . . shall be of the highest standards."  (*Id.*)

In all-capitalized text, the parties disclaimed any and all warranties other than those specifically provided in the agreement:

> Except as otherwise expressly set forth herein, or as is required by law, THERE ARE NO OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING THE WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

(*Id.*)  MTS reserved the right to reject warranty claims due to Timken's modifications, improper maintenance, or misuse of equipment.  (*Id.*)  Finally, the agreement contains an integration clause.  (*Id.*, at PageID #541.)

### C.2.    Bilateral Purchase Agreement, October 17, 2011

On October 17, 2021, the parties entered into a second agreement for the design, manufacture, delivery, testing, and commissioning of the other two components of the test system—the reaction structure and the foundation.  (ECF No. 35-6, PageID #544.)  This agreement also provides for installation tests and overall system responsibilities for the test system.  (*Id.*)  Like the first agreement, this second agreement provides that "no prior offers or communications will be incorporated in this agreement."  (*Id.*)  The second agreement required MTS to perform in accordance with three technical specifications included in a purchase order, incorporated into the agreement.  (*Id.*, PageID #544–45.)  These specifications required MTS to design and supply the reaction structure, design the foundation, and perform specified installation tests.  (ECF No. 36-1, PageID #672; ECF No. 36-3, PageID #735–36; ECF No. 36-4, PageID #754–56.)

With respect to the foundation, the agreement called for MTS to deliver its design to certain specifications.  (ECF No. 35-6, PageID #544–45.)  Those

specifications identify delivery of the complete foundation design as the first deliverable for MTS and make final acceptance contingent on a non-party's successful test of the entire system, including the foundation. (ECF No. 36-3, § 9.1, PageID #749.)

The second agreement has a total, fixed contract price of $1,265,000. (ECF No. 35-6, PageID #545.) Of this amount, the reaction structure cost $1,162.541, and the foundation design comprised the balance of $102,459. (*Id.*) Installation tests and system responsibilities were included in the contract price. (*Id.*) This second agreement includes a payment schedule, requiring Timken to make payments upon the completion of certain services provided by MTS. Specifically, the payment schedule required Timken to provide 25% as a down payment, 25% to be invoiced by January 5, 2012, 40% payment following delivery and a successful test of the reaction structure, and 10% upon passing "Final Acceptance Test at Buyer's facility as specified, complete delivery of the Merchandise, completion of specified training, delivery and review of specified documentation to Buyer and Seller to provide an acceptable Final Release and Waiver of Liens prior to payment." (*Id.*, PageID #547.)

Like the first agreement, this second agreement contains a warranty. (*Id.*, PageID #547.) In Section 2(A), MTS warranted, for a period of "twelve (12) months after Final Acceptance," that the merchandise, including goods and services, was to be free from "any defects or deficiencies in design, material or workmanship." (*Id.*) Finally, the second agreement also contains an integration clause. (*Id.*, PageID #553.)

### D.    Issues with the System

MTS delivered the NTL 5U to Timken on December 11, 2012.  (ECF No. 36-7, PageID #806.)  According to the record, this component was delivered to the Wind Center, not assembled there.  (*Id.*; *see also* ECF No. 35-3, PageID #479–80.)  On February 20, 2013, MTS delivered the reaction structure.  (ECF No. 35-8, PageID #568.)  Like the NTL 5U, the record shows the reaction structure was delivered to the Wind Center.  (*Id.*)  As for the foundation, MTS delivered the design before the end of 2012.  (ECF No. 35-3, PageID #480.)  Third parties then built the foundation in place at the Wind Center.  (ECF No. 43-1, ¶¶ 19–20, PageID #1251.)  Following post-shipment testing, Timken formally accepted delivery of the test system on August 23, 2013, though some items remained to be installed and some issues to be resolved.  (ECF No. 35-10, PageID #597–99.)  This acceptance triggered the one-year warranty in the parties' agreements.  (*Id.*, PageID #597.)

After acceptance, Timken began experiencing numerous issues with the test system.  (ECF No. 35-11, PageID #601–03.)  As just one example, in 2015 Timken discovered cracks in the frame for the NTL 5U.  (ECF No. 35-3, PageID #461.)  MTS inspected the cracks and determined the cause.  (*Id*., PageID #462-63; ECF No. 43-1, ¶ 32, PageID #1253.)  MTS continued to assist Timken with these issues at no charge even after expiration of the one-year warranty.  (ECF No. 43-1, ¶ 32, PageID #1253.)

On November 15, 2017, Timken discovered that the shaft of the NTL 5U had cracked.  (*Id.*, ¶ 47, PageID #1256.)  MTS undertook a root-cause investigation and determined that "under the maximum applied loading the shaft material was being stressed higher than originally expected in the threaded portion of the shaft."  (ECF

No. 44-9, PageID #1547.)   Correcting this issue required design and materials changes to various components of the shaft and related components.  (*Id.*, PageID #1547–50.)

MTS and Timken had numerous communications about the situation.  (*See, e.g.*, ECF No. 44-13.)  In a conference call between representatives of both parties on April 18, 2018, MTS informed Timken (according to its contemporaneous notes) that "with present learning in [the materials'] application, the upgrade [to an NTL 10] is larger than [MTS] anticipated."  (*Id.*, PageID #1610.)  Additionally, in that call MTS advised that "the system is not upgradeable in the manner [MTS] originally proposed."  (*Id.*)  In a call the following month, MTS reported that it "now knows that simply adding 8 axial actuators would not be sufficient to deliver full NTL-10 functionality."  (ECF No. 44-14, PageID #1614.)  After continuing discussions, MTS quoted Timken a price of $4,050,000 to complete the NTL 10 upgrade.  (ECF No. 44-12, PageID #1593.)

## STATEMENT OF THE CASE

Timken brings claims for breach of contract (Counts I and II), breach of warranty (Count III), fraudulent inducement (Count IV), and, pled in the alternative, negligent misrepresentation (Count V).  Timken's contract claims allege that MTS's design and oversight of construction and installation of the test system breached the parties' agreements (Count I) and that MTS failed to make the test system able to be upgraded (Count II).  MTS moves for summary judgment on each count.  (ECF

No. 35.)  Additionally, Timken moves for summary judgment on the statute-of-limitations defense MTS asserts.  (ECF No. 37.)

## ANALYSIS

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  On a motion for summary judgment, the Court must view evidence in the light most favorable to the non-moving party.  *Kirilenko-Ison v. Board of Educ. of Danville Indep. Schs.*, 974 F.3d 652, 660 (6th Cir. 2020) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

On a motion for summary judgment, the moving party has the initial burden of establishing that there are no genuine issues of material fact as to an essential element of the claim or defense at issue.  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 & n.12 (6th Cir. 1989); *Chappell v. City of Cleveland*, 584 F. Supp. 2d 974, 988 (N.D. Ohio 2008).  After discovery, summary judgment is appropriate if the non-moving party fails to establish "an element essential to that party's case and upon which that party will bear the burden of proof at trial."  *Tokmenko v. MetroHealth Sys.*, 488 F. Supp. 3d 571, 576 (N.D. Ohio 2020) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

To determine whether a genuine dispute about material facts exists, it is not the Court's duty to search the record; instead, the parties must bring those facts to the Court's attention.  *See Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087 (6th

12

Cir. 1996). "The party seeking summary judgment has the initial burden of informing the court of the basis for its motion" and identifying the portions of the record "which it believes demonstrate the absence of a genuine issue of material fact." *Tokmenko*, 488 F. Supp. 3d at 576 (citing *Celotex Corp.*, 477 U.S. at 322). Then, the nonmoving party must "set forth specific facts showing there is a genuine issue for trial." *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986)). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586.

If a genuine dispute exists, meaning "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," summary judgment is not appropriate. *Tokmenko*, 488 F. Supp. 3d at 576 (citing *Anderson*, 477 U.S. at 250). However, if "the evidence is merely colorable or is not significantly probative," summary judgment for the movant is proper. *Id.* The "mere existence of some factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Anderson*, 477 U.S. at 247–48).

## I. Breach of Contract and Statute of Limitations

The parties agree that Ohio law governs their contracts. (ECF No. 35-5, PageID #539; ECF No. 35-6, PageID #551.) Ohio has adopted the applicable provisions of Article 2 of the Uniform Commercial Code. *See* Ohio Rev. Code §§ 1302.01–1302.98. MTS argues that the U.C.C.'s four-year statute of limitations for breach of contract bars Timken's claims. *See* Ohio Rev. Code § 1302.98(A).

13

Timken counters that both agreements are contracts for services such that the U.C.C. does not apply.  (ECF No. 37; ECF No. 43, PageID #1226.)  Instead, Timken maintains Ohio's general eight-year statute of limitations governs under Section 2305.06 of the Ohio Revised Code.  (ECF No. 37, PageID #895; ECF No. 43, PageID #1236.)

The U.C.C. applies only to "transactions in goods."  Ohio Rev. Code § 1302.02. Under the statute, the term "goods" means "all things (including specially manufactured goods) which are *movable* at the time of identification to the contract for sale other than . . . things in action."  Ohio Rev. Code § 1302.01(A)(8) (emphasis added).  When interpreting the statute, the Ohio Supreme Court looks to the official comment to the U.C.C.  *See Casserlie v. Shell Oil Co.*, 121 Ohio St.3d 55, 2009-Ohio-3, 902 N.E.2d 1, ¶ 18.  It makes clear that "[t]he definition of goods is based on the concept of movability."  Official Comment, Ohio Rev. Code § 1302.01.  Significantly, depending on whether a contract is for goods or services, Article 2 applies in its entirety or not at all.  67 Am. Jur. 2d *Sales* § 31 (2014).  Under the U.C.C.'s definition of the term, the parties dispute whether the test system constitutes a good.

Timken argues that the contracts at issue bear none of the hallmarks of a typical contract for goods under the U.C.C.  Be that as it may, the statute applies to "specially manufactured goods," not just the types of bulk sales and the like to which Timken points.  Ohio Rev. Code § 1302.01(A)(8).  Moreover, applying Ohio law, the Sixth Circuit recognizes that the term "goods" under the U.C.C. "should be viewed as being broad in scope as to carry out the underlying purpose of the Code in achieving uniformity in commercial transactions."  *Mead Corp. v. McNally-Pittsburgh Mfg.*

14

*Corp.*, 654 F.2d 1197, 1199 n.1. (6th Cir. 1981) (quotation omitted).  In articulating this position, the court favorably cited *Pittsburgh-Des Moines Steel Co. v. Brookhaven Manor Water Co.*, 532 F.2d 572, 579–80 (7th Cir. 1976).  There, the Seventh Circuit briefly surveyed the meaning of the term "goods" in commercial law and concluded that a manufactured water tank holding one million gallons constituted a good under the U.C.C.'s liberal definition.  *Id.*  In reaching this conclusion, the court emphasized that the tank, though large, remained movable—the touchstone of the U.C.C.'s definition.  *Id.* at 580.

### I.A.  Movability

As a threshold matter, Timken argues that the test system is not a good because it is not movable.  (ECF No. 37, PageID #880–81.)  Further, according to Timken, the test system is not a good because it cannot be removed without "material harm to the realty."  (ECF No. 43, PageID #1226.)  For its part, MTS points out that, at the time of the identification of the NTL 5U, the reaction structure, and the foundation design to the contract for sale, they were movable.  (ECF No. 41, PageID #1091–92) (citing Ohio Rev. Code § 1302.01(A)(11)).  Timken makes three arguments the test system does not constitute a good under the U.C.C., each of which the Court considers in turn.

### I.A.1. Movable and Existing

Timken maintains the U.C.C. requires that a good be simultaneously movable and existing.  (ECF No. 37, PageID #896.)  Citing *Helvey v. Wabash County REMC*, 278 N.E.2d 608, 610 (Ind. Ct. App. 1972), and *Chlan v. KDI Sylvan Pools, Inc.*, 452 A.2d 1259, 1261 (Md. Ct. Spec. App. 1982), Timken argues that "if something must

be constructed on-site to exist, and that thing is immobile once completed, it is not a good." (ECF No. 37, PageID #896.)

Taking this argument one step at a time, neither case Timken cites has much bearing substantively on the dispute between the parties. *Helvey* involves claims against an electric company for damage to household appliances, and *Chlan* concerned installation of an in-ground swimming pool. Beyond the basic principle for which they are cited, the cases do not extend the requirement that goods be simultaneously existing and movable as far as Timken asserts. Timken argues that the U.C.C. determines movability when merchandise is put to its ultimate use, upon completion of construction of the Wind Center in this case. (*Id.*)

Under the plain language of the statute, however, a good is "movable at the time of identification to the contract for sale." Ohio Rev. Code § 1302.01(A)(8). Unless the parties agree otherwise, identification takes place under Ohio law "when the contract is made if it is for the sale of goods already existing and identified" or "when goods are shipped, marked, or otherwise designated by the seller as goods to which the contract refers." *Id.* § 1302.45(A)(1) & (2); *see also* 1302.01(B)(6). Here, the parties agreed that identification would occur at "the earliest moment" possible and "in any event no later than the time of delivery of the Merchandise to Buyer's facility." (ECF No. 35-5, PageID #536; ECF No. 35-6, PageID #549.)

MTS delivered the NTL 5U to Timken on December 11, 2012 (ECF No. 36-7, PageID #806) and the reaction structure on February 20, 2013 (ECF No. 35-8, PageID #568). By then, MTS had delivered the design for the foundation. (ECF No. 35-3,

PageID #480.)  These facts establish that the merchandise at issue was identifiable, both under the parties' agreements and under Ohio law, before completion of construction of the test system as a whole, which did not occur until final acceptance on August 23, 2013.  (ECF No. 35-10, PageID #597–99.)  Therefore, the U.C.C. treats the merchandise as goods.

Timken objects that MTS contracted to supply a test *system*.  But the parties' agreements say otherwise.  Further, Timken relies on final acceptance and argues that the agreements required MTS to "provide testing and analysis to demonstrate the operation of the complete System," which is immovable.  (ECF No. 47, PageID #1629.)  However, the parties' agreements identify the merchandise to the contracts no later than delivery, not at final acceptance.  Although the second contract, involving the reaction structure and the foundation, also included specifications for system tests, by its nature that aspect of the parties' agreements does not involve merchandise that can be identified to a contract.  Ultimately, that argument speaks more to the predominant purpose of the agreements, addressed below, and does not change the threshold analysis on movability under the agreements or Ohio law.  In the end, the provisions in the parties' agreements identifying the merchandise no later than delivery comports with the definitions under the U.C.C. codified at Section 1302.01(B)(6) and Section 1302.45.

### I.A.2. Integral, Structural Part of the Wind Center

Timken argues that the test system comprises an integral part of the land and building and, therefore, constitutes a "structural part of the [Wind] Center rather than a good."  (ECF No. 37, PageID #880; *see also id.* PageID #895–96.)  In Timken's

view, the test system was constructed simultaneously with the Wind Center such that, once the test system "came into existence" when the NTL 5U was connected to the reaction structure and foundation, it was "affixed" to the Center. (*Id*., PageID #897.) In addition, Timken points to the lack of utility of each separate component of the test system until connected and integrated into the overall test system. (*Id*.) Of course, given its size and the foundation in particular, the test system is immobile.

This argument looks at the movability of the test system and its components at the wrong moment in time. From Timken's standpoint, it understandably focuses on the Wind Center, which is an immovable object, not a good, because that is the project it was working to develop and construct. But the contracts between the parties were not for the Wind Center as a whole, even though they address some system-wide responsibilities. Instead, the parties' contracts relate to three discrete components, which the record shows were movable when identified to the contract. As a matter of law, goods "must be both existing and identified before any interest in them can pass." Ohio Rev. Code § 1302.01(A)(8). This definition confirms that the time for determining whether an item is a good relates to transfer of title, which on the facts here is a discrete moment that differs from integration into or completion of the Wind Center. (ECF No. 35-5, PageID #536; ECF No. 35-6, PageID #549.)

Beyond the contracts themselves, the summary-judgment record confirms that MTS had no role in the design or construction of the Wind Center itself. (ECF No. 41-1, ¶ 5, PageID #1112.) Indeed, the project was not a joint venture or

partnership but a series of contractual arrangements for MTS to supply particular equipment and services.

\*       \*       \*

For its argument, Timken relies on three cases involving elevators, sprinkler systems, and windows where courts ruled that these items did not constitute goods under the U.C.C.  (ECF No. 37, PageID #896.)  Each is distinguishable.

*First*, Timken relies on *Chestnut Hill Development Corp. v. Otis Elevator Co.*, 653 F. Supp. 927, 932 (D. Mass. 1987).  There, a subcontractor agreed to "furnish and install five elevators" as part of the construction of a multimillion-dollar condominium complex."  *Id.* at 929.  The court held that the elevator system, once installed, was an integral part of the building and "structures that are 'attached to realty' such as this elevator system, are not 'goods' within the meaning of the UCC."  *Id.* at 932 (quoting *White v. Peabody Constr. Co.*, 434 N.E.2d 1015, 1022 (Mass. 1982)).  Setting aside differences in the contracts at issue there and here, the First Circuit subsequently distinguished *Chestnut Hill Development*.  In doing so, the court emphasized that determining whether items constitute goods under the U.C.C. occurs when they are identified to the contract, not when any system may ultimately be installed in a building.  *Cambridge Plating Co. v. NAPCO, Inc.*, 991 F.2d 21, 24–25 (1st Cir. 1993).

*Second*, Timken cites *Milau Associates, Inc. v. North Avenue Development Corp.*, 368 N.E.2d 1247 (N.Y. Ct. App. 1977).  That case involved a contract to install a sprinkler system in commercial real estate.  But the appellate court determined

that the contract primarily involved services and so made no determination whether the sprinkler system constituted a good. *Id.* at 1251.

*Third*, Timken cites *Weiss v. MI Home Products*, 877 N.E.2d 442 (Ill. App. Ct. 2007). There, the owners of a townhouse filed suit against the manufacturer of the windows installed in their home on various theories when they allegedly failed. With respect to the U.C.C., the court determined that, because the windows were installed, they were no longer goods. *Id.* at 445. Whatever the particulars of the transaction in *Weiss*, the consumer purchase there bears little resemblance to the dispute between the parties in this sophisticated commercial transaction. Therefore, the case lacks persuasive value here.

Rather than advancing Timken's argument, these cases underscore that the contracts at issue identify merchandise that was movable at the time when identified to the contracts. Therefore, under Section 1302.01(A)(8), the parties' agreements involve the sale of goods subject to the U.C.C.

### I.A.3. Severability of the Merchandise Without Material Harm

Relatedly, Timken argues that the test system is not a good because it cannot be severed from its current location without material harm to the Wind Center. (ECF No. 37, PageID #897–98.) MTS disputes that claim (*see, e.g.*, ECF No. 41-1, ¶ 13, PageID #1113), but on summary judgment the Court will construe the record in Timken's favor on this point (as the non-movant on MTS's motion). Timken argues that the "U.C.C. is clear that severability from realty without material harm is the test when considering whether something is a good." (ECF No. 37, PageID #881; *see also id.*, PageID #897–900.)

20

Under the official comment to Section 2-105, the U.C.C. requires that "goods" be capable of severance without material harm to the realty to which they are attached.  The official comment provides:

> The use of the word "fixtures" is avoided in view of the diversity of definitions of that term.  This Article [Chapter] in including within its scope "things attached to realty" adds the further test that they must be capable of severance without material harm thereto.  As between the parties any identified thing which falls within that definition becomes "goods" upon the making of the contract for sale.

Official Comment, Ohio Rev. Code § 1302.01.  In common usage, the term realty includes both real estate and structures.  *See Realty*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/realty (last visited May 13, 2021); *Real Estate*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/real%20estate (last visited May 13, 2021).

Based on the official comment, "things attached to realty which are not capable of severance without causing material harm to that realty are not 'goods' under R.C. 1302.01(A)(8)" and, therefore, not subject to the U.C.C.  *Loyd v. Ewald*, No. 87-CA-33, 1988 Ohio App. LEXIS 1235, at *5 (Ohio Ct. App. Apr. 6, 1988).  In *Loyd*, an Ohio appellate court held that a built-in swimming pool and deck were not severable from realty because they required the excavation of a large hole, *see id.* at *5–6, one considerably smaller than would than would be left by removing the foundation for the test system from the Wind Center (*see, e.g.*, ECF No. 37-4).  However, "the fact that goods will be installed into a building and become fixtures does not destroy their character as goods when they are movable at the time of the

21

sale that antedated their becoming fixtures" or attached to realty.  2 Anderson U.C.C. § 2-105:36 (3d. ed.) (footnote omitted).

In other words, Timken's reliance on *Loyd* overlooks the focus in Section 1302.01(A)(8) on identification of merchandise to the contract to determine movability.  None of the other authorities on which Timken relies to advance this argument, which generally deal with appliances and the like, persuade the Court that the focus in the official comment on severability from realty without material harm presents the correct legal framework for analysis on the facts and circumstances of this case where the parties in their agreements fixed a time for identification of the merchandise to the contract before final acceptance.

*          *          *

For all these reasons, the Court concludes that Timken is not entitled to judgment as a matter of law on MTS's statute-of-limitations defense.  Upon review of the record, the parties' agreements and Ohio's version of the U.C.C. do not as a matter of law support Timken's argument that the subjects of the parties' dispute are not movable.  As a result, they constitute goods under the U.C.C.  This determination comports with the Sixth Circuit's reasoning in *Mead Corp.*, 654 F.2d at 1199 n.1.

### I.B.    The Predominant Purpose of the Agreements

Still, that conclusion does not end the analysis.  Although the Ohio Supreme Court has not addressed the issue, Ohio courts uniformly use a predominant-purpose test to determine whether the U.C.C. applies to a mixed contract for goods and services.  Generally, this test examines whether the predominant purpose of the contract is "the rendition of service, with goods incidentally involved, or whether the

22

contract is for the sale of goods, with labor incidentally involved." *Allied Indus. Serv. Corp. v. Kasle Iron & Metals, Inc.*, 62 Ohio App. 2d 144, 147, 405 N.E.2d 307, 310 (Ohio Ct. App. 1977) (citations omitted); *see also Mecanique C.N.C., Inc. v. Durr Env't, Inc.*, 304 F. Supp. 2d 971, 976 (S.D. Ohio 2004).  "Put more simply, the question is whether the purchaser's ultimate goal is to acquire a product or procure a service." *Mueller v. All Temp Refrigeration*, No. 15-13-08, 2014-Ohio-2718, ¶ 34 (Ohio Ct. App.) (quoting *Mecanique C.N.C.*, 304 F. Supp. 2d at 977).  In such cases, the burden of proof lies with the party who asserts that the U.C.C. applies.  *Mecanique C.N.C.*, 304 F. Supp. 2d at 976 (collecting cases).  Upon review of the parties' agreements, the Court finds that they include provisions for both goods and services and are, therefore, mixed contracts.

Normally, the predominant purpose of a mixed transaction for goods and services presents a question of fact for a jury.  *Id.*; *H & C Ag Servs., LLC v. Ohio Fresh Eggs, LLC*, 2015-Ohio-3714, ¶ 35, 41 N.E.3d 915, 922 (Ohio Ct. App.) (collecting cases).  Where "there are no disputed facts that raise issues to be decided by the jury, it is proper for the trial court to rule as a matter of law on whether the contract is covered by Article Two." *Valleaire Golf Club v. Conrad*, No. 03CA0006-M, 2003-Ohio-6575, ¶ 6 (Ohio Ct. App.); *see also Mecanique C.N.C.*, 4 F. Supp. 2d at 976 (collecting cases).  If the division between goods and services presents a "close call," the court may still rule as a matter of law absent a genuine dispute of material fact.  *Valleaire Golf Club*, 2003-Ohio-6575, ¶ 7.

In analyzing the predominant purpose of the parties' transactions, courts consider several factors, including: (1) "the nature and language of the contract"; (2) "the nature of the business of the supplier or seller"; (3) "the price or value allocation in the contract between goods and services to be provided"; (4) "the issues involved in the dispute"; and (5) "the compensation structure of the contract." *Executone of Columbus, Inc. v. Inter-Tel, Inc.*, 665 F.Supp.2d 899, 907 (S.D. Ohio 2009) (quoting *Heidtman Steel Prods. Inc. v. Compuware Corp.*, No. 3:97CV7389, 2000 WL 621144, at *5 (N.D. Ohio Feb. 15, 2000).

### I.B.1. The Nature and Language of the Contracts

MTS argues the parties' agreements are predominantly for goods based on language in the contract. For example, MTS points to the titles of the agreements, "Bilateral Purchase Agreement," which list the parties as Buyer and Seller and reference specific purchase orders and purchase order numbers, all of which MTS argues bear the hallmarks of contracts for goods. (ECF No. 35, PageID #421.) Timken responds, and the Court agrees, that this specific language has little if any relevance. Moreover, the language and cases on which MTS relies typically appear in construction contracts. Without question, however, the agreements at issue serve a different purpose and include certain services as part of their object.

Looking to the "overall language" of the agreements, Timken argues the transactions show a predominant purpose for the provision of services. (ECF No. 43, PageID #1231.) But the Court cannot go that far. To the contrary, in the Court's view, the language of the agreements evinces a primary intent on the part of Timken to acquire particular merchandise. That Timken wanted to ensure integration of that

merchandise into the final product does not change the predominant purpose of the agreements.  Upon close review, the language of the parties' agreements bears this conclusion out.  For example, the U.C.C. requires contractual language expressly excluding the implied warranties of merchantability and fitness to be conspicuous.  *See* Ohio Rev. Code § 1302.29(B).  Here, the contracts follow the U.C.C. to do so (ECF No. 35-5, PageID #535; ECF No. 35-6, PageID #548), demonstrating that the parties envisioned the U.C.C. governing.  Notwithstanding the provision of services in the agreements, the nature and language of the parties' agreements tilts in favor of a predominant purpose for the purchase and sale of goods, not services.

### I.B.2. The Nature of MTS's Business

MTS argues that it is not in the business of "selling its design or engineering services outside the context of selling or supporting one of its manufactured products."  (ECF No. 35, PageID #423.)  All the services MTS performed under the agreements, it argues, were "undertaken in order to deliver the completed product per the Purchase Agreements' specifications."  (*Id*.)  Timken disagrees, citing information on MTS's website that states MTS works "side-by-side with engineers in a wide range of industries to solve complex challenges."  (ECF No. 43, PageID #1231.)  Without more, however, that language does not make MTS a service provider.  Moreover, the record does not establish that the language on MTS's website to which Timken points appeared there in 2011 when the parties signed the agreements.

Even considering that information from MTS's website, and construing the record in the light most favorable to Timken, the record shows that services are secondary to MTS's business both generally and in connection with the transactions

at issue here.  (*See, e.g.*, ECF No. 35-1, ¶ 10, PageID #439; ECF No. 35-4, PageID #512; ECF No. 35-7, PageID #557.)  MTS gave Timken a quote based on the NTL 5U. (ECF No. 36-5, PageID #764; ECF No. 36-6, PageID #784.)  Given the nature of MTS's business, "spending significant time and resources to design or engineer the product sold does not transform a contract for goods into a contract for services."  *Action Grp., Inc. v. NanoStatistics Corp.,* No. 13Ap-72, 2013-Ohio-5542, ¶ 45 (Ohio Ct. App.). Based on the record and the nature of MTS's business, the services it offered here related to completion or installation of the components it delivered (the NTL 5U and the reaction structure).

### I.B.3. The Price Allocation Between Goods and Services

The parties' first agreement, dated July 1, 2011, did not allocate the purchase price of $3,490,000 between the NTL 5U and the services associated with testing the unit at the Wind Center, training, and startup assistance.  (ECF No. 35-5, PageID #533.)  For the second agreement, dated October 17, 2011, the total contract price of $1,265,000 included $102,459 for the design of the foundation with the balance ($1,162,541) for the reaction structure.  (ECF No. 35-6, PageID #545.)  That total price included services related to installation tests and MTS's system responsibilities. (*Id.*)  In this way, the face of the agreements places an emphasis on the transactions as sales of goods.

But Timken points to MTS's internal breakdown of costs between labor and materials, both the for the NTL 5U individually and in the overall relationship between the two entities.  (ECF No. 44-15, PageID #1616.)  For the NTL 5U, that analysis shows approximately 51% of the costs attributable to labor and 45% to

materials.  (*Id.*)  Overall, that allocation was 47.5% for labor.  (ECF No. 44-16, PageID #1618.)  Nonetheless, the agreements did not charge for services specifically, and MTS did not bill Timken for services.  Even so, the roughly equivalent internal allocations MTS made at best puts this factor into equipoise.  But the law tilts the balance in MTS's favor.  *See, e.g.*, *BMC Indus. v. Barth Indus.*, 160 F.3d 1322, 1330 (11th Cir. 1998) (observing that a contract price not billing for services makes it one for goods); *Triangle Underwriters, Inc. v. Honeywell, Inc.*, 604 F.2d 737, 743 (2d Cir. 1979) (concluding that contractual limitation of compensation to the purchase price provides indicia of a sale of goods, not services).

### I.B.4. The Issues Involved in the Dispute

Timken argues that MTS did much more than simply sell a custom-designed product.  In its view, the issues involved in the dispute relate to MTS's allegedly faulty "design and oversight services."  (ECF No. 43, PageID #1233.)  Further, Timken characterizes the parties' relationship as a "design-services contract," the goal of which was for MTS to work "side-by-side" with Timken to "design, engineer, construct, and operate the multi-million-dollar System that was being constructed as part of a new building."  (ECF No. 43, PageID #1227.)

Here, the record demonstrates that Timken's complaints relate to the equipment MTS supplied and the related services associated with integrating it into the Wind Center.  But Timken primarily takes issue with the equipment MTS supplied.  Timken's technical representative and spokesperson in this litigation testified as much.  (ECF No. 35-3, PageID #468.)  Indeed, the record as a whole shows that, although Timken has service-related complaints about MTS, the primary

purpose of the parties' agreements related to the sale of the components at issue:  the NTL 5U, reaction structure, and design for the foundation.

"[A]lmost all contracts involving commercial goods include some aspect of services, the fact that the manufacturer uses their effort and expertise in producing the good does not necessarily mean that the buyer is purchasing a service." *Allied Erecting & Dismantling Co. v. Ohio Edison Co.*, 2015-Ohio-2328, 34 N.E.3d 182, ¶ 13 (Ohio Ct. App. 2015).  One problem with hybrid contracts within this analytical framework is that the goods and services at issue often have materially less value, if any, without the other.  Ultimately, the record demonstrates the parties contracted for a sale of goods and ancillary services, such that the former constitutes the predominant purpose notwithstanding Timken's framing of the dispute now.

### I.B.5. The Compensation Structure of the Agreements

In the first agreement between the parties, for the NTL 5U, the payment schedule provides that 35% of the contract price was to be invoiced upon Timken's acceptance of the agreement, 15% was to be invoiced on December 2, 2011, 40% was to be invoiced following delivery of the merchandise, and 10% was to be invoiced upon Final Acceptance.  (ECF No. 35-5, PageID #534.)  In the second agreement, 25% of the contract price was to be invoiced upon acceptance of the agreement, 25% was to be invoiced by January 5, 2012, 40% was to be invoiced following delivery of the Reaction Structure and successful testing of the System, and 10% was to be invoiced upon passing final acceptance and completion of training.  (ECF No. 35-6, PageID #547.) These compensation terms weigh in favor of a contract for services.  As Timken

points out, each payment in the agreements relates to a specific service objective for MTS to meet.

### I.B.6. Post-Installation Actions

Timken points to an additional factor on the facts and circumstances of this case. Specifically, Timken argues that MTS maintained, developed, and helped run the equipment it sold after delivery, suggesting a contract for services as the predominant purpose of the agreements. Setting aside the overlap of this argument with certain of the other factors, the record shows (as already discussed) that the parties contracted for services, both to integrate the NTL 5U and reaction structure and on the broader test system as a whole. But that is the nature of a hybrid contract. Beyond these agreements, the record also shows Timken separately contracted with MTS for certain ongoing maintenance services. (*See, e.g.*, ECF No. 49-1.) Additionally, MTS undertook various efforts at little to no cost to Timken. (ECF No. 43-1, ¶ 32, PageID #1253; ECF No. 43-8, PageID #1324.)

Construing the record in Timken's favor, and taking post-installation actions as a separate factor in the analysis, the Court determines that MTS's post-installation actions arose more from MTS's corporate objectives than its contractual obligations. Therefore, this factor does not tilt the balance in Timken's favor.

\* \* \*

Considering each of these factors individually and collectively against the record as whole, the Court determines that there are no disputed facts that require submission of this question to a jury. Further, as a matter of law, the Court concludes that MTS has carried its burden of establishing that the predominant purpose of the

parties' agreements was the sale of goods which predominates over the related services. In the Court's view, the question is not close, and reasonable minds can come to but one conclusion based on the record. Therefore, the U.C.C. applies and provides the governing law.

### I.C. Statute of Limitations

Under Ohio's U.C.C., "an action for breach of any contract for sale must be commenced within four years after the cause of action has accrued." Ohio Rev. Code § 1302.98(A). "A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach." *Id.* § 1302.98(B). Timken makes no argument that it filed suit within the four-year statute of limitation. In fact, the record establishes that a cause of action for breach of contract accrued no later than the end of 2013. Timken filed suit on February 15, 2019 after the parties executed a six-month tolling agreement. Even with the tolling period, based on the last occurring breach Timken alleges, the four-year statute of limitations expired by the end of 2017. Therefore, Timken's claims for breach of contract are time-barred, and MTS is entitled to summary judgment on Count I and Count II.

## II. Breach of Warranty

In Count III, Timken asserts a claim for breach of express warranty. The parties' agreements contain one-year warranties. (ECF No. 35-5, PageID #535; ECF No. 35-6, PageID #547.) Under the U.C.C. as adopted in Ohio, the four-year statute of limitations applies to claims for breach of warranty unless the parties provide otherwise. Ohio Rev. Code § 1302.98(A). Further, that limitations period begins to run from the date of delivery. *Id.* § 1302.98(B). Under the parties' agreements, the

one-year warranty began to run with final acceptance, which occurred on August 23, 2013. (ECF No. 35-10, PageID #597–99.)  Because Timken did not file suit within four years of final acceptance, Timken's breach of warranty claim is time-barred unless an exception applies.

### II.A.  Future Performance

Ohio law contains an exception to the limitations period for a claim where "a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance." *Id.* § 1302.98(B).  In such a case, "the cause of action accrues when the breach is or should have been discovered."  *Id.* Based on this exception, Timken argues it timely asserts a claim for breach of warranty of future performance.

Here, the agreements provide that MTS "warrants for a period of twelve (12) months after Final Acceptance, . . . [that t]he Merchandise shall perform in accordance with the requirements of the Purchase Order Documents and be fit for the use and purposes specified." (ECF No. 35-5, PageID #535; *see also*, ECF No. 35-6, PageID #547.)  Further, MTS warranted that the merchandise would be free from "defects or deficiencies" for "twelve (12) months."  (ECF No. 35-5, PageID #535; ECF No. 35-6, PageID #547.)  One of the purchase order documents, the specifications for the NTL 5U, contained MTS's representation "that the equipment they supply should not have any problem with the continuous and proper operation of the proposed test periods."  (ECF No. 36-2, § 7.8.3, PageID #721.)  But during the warranty period, Timken was unable to run the test system continuously or properly, contrary to MTS's representations.  (ECF No. 35-3, PageID #461–62.)

31

Additionally, Timken claims that latent design defects in the test system arose and existed throughout the warranty period.  (*See, e.g.*, ECF No. 35-3, PageID #461–62; ECF No. 43-12, PageID #1370; ECF No. 43-6, PageID #1307.)  But these defects remained hidden and, Timken argues, could not be discovered through the exercise of ordinary diligence until MTS issued a report dated January 24, 2018 admitting that the NTL 5U's shaft had an improper design.  (ECF No. 44-9, PageID #1546–47.)

MTS disputes many of the facts underlying Timken's arguments.  But on summary judgment the Court must construe the record in favor of Timken as the non-moving party.  Contrary to MTS's suggestion at oral argument, Timken's version of the facts does not rely on affidavits impermissibly contradicting the witness's own deposition testimony.  For example, Timken's corporate representative testified that the company did not appreciate the latent defects until January 2018 when MTS provided its failure analysis report and that the NTL 5U as originally designed would not have supported an upgrade.  (ECF No. 35-3, PageID #481.)  But the question remains whether, taking these facts as true, MTS is nonetheless entitled to judgment as a matter of law.

### II.B.  Future Performance and Limitation of Remedies

"Ohio courts have grappled with the meaning of the future performance language" in Section 1302.98(B).  *Allen v. Andersen Windows, Inc.*, 913 F. Supp. 2d 490, 501 (S.D. Ohio 2012) (citations and quotations omitted).  Some courts consider a promise to repair or replace defects for a period of time a warranty of future performance.  This line of authority generally follows the Sixth Circuit's ruling in

*Standard Alliance Industries, Inc. v. Black Clawson Co.*, 587 F.2d 813, 820–21 (6th Cir. 1978).  There, the court ruled that, where the parties have an express warranty for a specified period of time, the U.C.C.'s future-performance exception applies.  *Id.*  When it reached this conclusion, the Sixth Circuit had little authority from Ohio courts on which to base its prediction of how the Ohio Supreme Court would rule.  *See Zaremba v. Martin Lumber & Cedar Co.*, 458 F. Supp. 2d 545, 551 (N.D. Ohio 2006) (noting that Ohio case law under Section 1302.98(B) provided little guidance when the Sixth Circuit decided *Standard Alliance*).

Six years after *Standard Alliance*, an intermediate Ohio appellate court considered the issue and reached the opposite conclusion.  *See Allis-Chalmers Credit Corp. v. Herbolt*, 17 Ohio App. 3d 230, 236, 479 N.E.2d 293, 300 (Ohio Ct. App. 1984) (per curiam).  Although the seller there expressly warranted its product would be free of defects for a period of time, the warranty limited liability to repair or replacement of the defective good.  Distinguishing between remedies and warranties under the U.C.C., the *Allis-Chalmers* Court disagreed with the Sixth Circuit's analysis:  "all promises are not warranties.  An express warranty is a promise which requires that the goods shall conform to the affirmation or promise.  Here, the promise required that the *seller's conduct* conform to the promise, not that the product's performance conform to the promise."  17 Ohio App. 3d at 237, 479 N.E.2d at 301 (cleaned up).

Since *Allis-Chalmers*, the weight of authority follows the approach of the Ohio appellate court, not the Sixth Circuit.  *See, e.g.*, *Allen v. Andersen Windows, Inc.*, 913 F. Supp. 490, 502 (S.D. Ohio 2012); *Zaremba*, 458 F. Supp. 2d at 551.  Still, the

courts are not uniform in this approach.  For example, one court agreed as a general matter that *Allis-Chalmers* provides the better rule, but recognized that a repair-or-replace remedy may also accompany a warranty for future performance.  *Siriano v. Goodman Mfg. Co., L.P.*, No. 2:14-cv-1131, 2015 WL 12748033, at *7, 2015 U.S. Dist. LEXIS 191458, at *19–20 (S.D. Ohio Aug. 18, 2015).  In such a circumstance, the court concluded that the future-performance exception applies to the particular claims the buyer brought.  *Id.*

Based on the language of Section 1302.98(B), the Court determines that the Ohio Supreme Court would likely follow the approach of *Allis-Chalmers* and the cases decided since *Standard Alliance* and throws its weight behind that position.  That view embraces the language of the U.C.C., under which the parties may limit remedies for breach of warranty.  Ohio Rev. Code § 1302.29(D); *id.* § 1302.93(A)(1).

### II.C.  Failure to Repair or Replace

That view of the future-performance exception still requires application to the facts presented.  MTS asserts that the agreements contain repair-and-replace warranties, not promises of future performance.  Naturally, Timken argues the opposite, pointing to language in the warranties obligating MTS to supply goods "of a good and adequate design" and "free from any defects or deficiencies in design, material or workmanship . . . and fit for the use and purposes specified."  (ECF No. 35-5, PageID #535; ECF No. 35-6, PageID #547.)  Further, Timken maintained at oral argument that the agreements' repair-and-replace remedies were not exclusive and focuses on various promises MTS made directed to the performance of its goods, not merely its conduct.  *See Allis-Chalmers*, 17 Ohio App. 3d at 237, 479 N.E.2d at 301.

Timken's argument overlooks the next paragraph of the warranty, which limits the remedies available to Timken.  (ECF No. 35-5, PageID #535; ECF No. 35-6, PageID #547.)  Beyond that, the agreements conspicuously disclaim all other warranties, express or implied.  (*Id.*)  Reading the parties' agreements as a whole, MTS did not warrant future performance, instead limiting remedies consistent with the *Allis-Chalmers* line of cases.  To resist this conclusion, Timken relies on *Siriano*.  But, as discussed, the contract in that case had both a repair-and-replace limitation of remedy *and* a warranty of future performance.  In contrast, the warranties in the agreements here contain only the former.

### II.D.  Upgrade and Specifications

Two final points.  First, Timken also argues that MTS warranted that the system could be upgraded in the future and claims breach, without regard to the applicable limitations period, because MTS took the position an upgrade would require rebuilding the NTL unit.  (ECF No. 44-14, PageID #1614.)  But what Timken calls warranties do not appear as such in the transaction documents.  Instead, they are specifications or descriptions of the scope of work.  (*See, e.g.*, ECF No. 36-1, ¶¶ 3.3, 5.7, PageID #677, 682.)  Warranties appear elsewhere.  Therefore, Timken's effort to save Count II of its complaint, alleging breach of contract based on an inability to upgrade the test system, by re-characterizing it as a breach of warranty that falls within the future-performance exception fails to withstand scrutiny under the parties' agreements.

Second, Timken maintains the specifications contain numerous warranties. Like upgradeability, the arguments regarding the specifications attempt to export

breaches of contract to the narrow future-performance exception to a warranty claim. With the plain language of the repair-and-replace limitation of remedies and the disclaimer of other warranties, the specifications offer no additional means for Timken to overcome the limitations period, which commenced upon final acceptance.

*       *       *

For these reasons, the Court concludes that the future performance exception does not apply.  Therefore, none of the breaches of warranty Timken argues is timely. Final acceptance occurred on August 23, 2013, such that any claim for breach of warranty had to be brought within four years of that date.  Although this result may appear unfair in the face of Timken's claims that it could not have discovered latent defects in the test system before 2018, a view of the facts the procedural posture of the case obligates the Court to accept as true, the plain language of the U.C.C. makes Timken's knowledge of the breach irrelevant.  "A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach." Ohio Rev. Code § 1302.98(B).  Accordingly, MTS is entitled to summary judgment on Count III.

## III.  Fraudulent Inducement and Negligent Misrepresentation

MTS argues that Timken cannot maintain its tort claims because they merge with its contract claims, which are time-barred.  Timken argues that its tort claims do not merge with its contract claims because it suffered damages that exist independently of its damages for breach of the agreements.  As presented to the Court, whether Timken may proceed with its tort claims presents both substantive and procedural questions.

36

### III.A. Merger of Tort and Contract Claims

Generally, "the existence of a contract action . . . excludes the opportunity to present the same case as a tort claim." *Wolfe v. Continental Cas. Co.*, 647 F.2d 705, 710 (6th Cir. 1981).  But Ohio law permits "an action for tort [to] be combined with and arise from the same operative facts as a breach of contract action." *Burns v. Prudential Secs., Inc.*, 167 Ohio App. 3d 809, 2006-Ohio-3550, 857 N.E.2d 621, ¶ 99 (citation omitted).  In such a case, tort claims may proceed where the defendant breached a duty apart from the contract:

> a tort claim based upon the same actions as those upon which a claim of breach of contract is based will exist independently of the contract action only if the breaching party also breaches a duty owed separately from that created by the contract, that is, a duty owed even if no contract existed.

*Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 115 Ohio App. 3d 137, 151, 684 N.E.2d 1261, 1270 (Ohio Ct. App. 1996) (citation omitted).

MTS concedes that Timken's tort claims rely on statements outside the contracts.  (ECF No. 35, PageID #431.)  For its part, Timken argues, among other things, that MTS induced it to enter into a contractual relationship.  In this respect, these tort claims rest on different actions and grounds than the contract and warranty counts discussed above.  Additionally, MTS argues that Timken must also demonstrate "actual damages attributable to the wrongful acts of the alleged tortfeasor which are in addition to those attributable to the breach of the contract." (ECF No. 35, PageID #430.)  Timken easily clears this bar.  In addition to the different legal elements for Timken's tort and contract claims, these claims use different measures of damages.  For these reasons, the record does not show that MTS is

entitled to judgment as a matter of law that Timken's tort and contract claims merge because they rely on different operative facts and different potential damages.

### III.B. Phase One Discovery

Before proceeding to the merits of MTS's arguments for summary judgment on these claims, the Court turns to Timken's procedural objection to MTS's motion. Timken maintains the Court previously limited discovery and summary judgment briefing to issues outlined in the Court's bifurcated discovery schedule. Under that schedule, Phase One included, as relevant here, "discovery on whether Timken has viable claims for fraud or negligent misrepresentation." (ECF No. 17, PageID #260.) The Court's scheduling order included this topic under the heading of "Limits on Issues Subject to Discovery and Dispositive Motion Practice." (*Id.*) That order directs discovery to proceed on the topics listed. (*Id.*, PageID #261.)

With respect to the tort claims, the parties offer competing interpretations of that order. Timken interprets the Court's order to mean that it is not required at this stage to prove every element of its fraud and negligent misrepresentation claims. (ECF No. 43, PageID #1241–42.) MTS disagrees and reads the order as including the merits of the tort claims in Phase One. (ECF No. 48, PageID #1676.) Beyond that, the parties point to each other's discovery conduct as justifying their respective positions. Finally, the parties' periodic status reports do not shed much light on the issue. They do, however, suggest that the parties initially at least contemplated further discovery after resolution of these threshold issues. (*See* ECF No. 51.)

At oral argument, counsel provided some additional helpful background and context. With the benefit of that additional information and further review of the

record, the Court interprets the Phase One discovery order as an effort to limit discovery to threshold questions regarding the statute of limitations and whether, as a matter of law, Timken may proceed with its tort claims in the face of the merger argument MTS advances. Although considerable discovery has taken place, some additional depositions of fact witnesses may be necessary and, significantly, no expert depositions have yet occurred. Based on this state of the record, the Court determines that the Phase One order intended for further proceedings and discovery should Timken's claims survive MTS's statute of limitations defense and merger argument.

Also at oral argument, although the Court had not reached a conclusion about how to interpret the Phase One order, the Court asked MTS whether it wanted to withdraw its motion for summary judgment based on the Court's Civil Standing Order. (*See also* Minutes of Proceedings, Apr. 27, 2021.) Under that Order, the Court will not entertain multiple motions for summary judgment by the same party. This case illustrates why. To use limited judicial resources most efficiently and effectively, the Court must enforce some reasonable limits to preserve its ability to manage this and other cases on its docket. After consideration, MTS advised the Court by email (copying counsel of record) that it wished to stand on its motion for summary judgment on Timken's tort claims. Therefore, the Court turns to MTS's motion for summary judgment on Timken's tort claims based on the present status of the record.

### III.C. Timken's Claims for Fraud and Negligent Misrepresentation

MTS maintains that "Timken wholly fails to oppose MTS's motion to dismiss Timken's fraud and negligent misrepresentation claims." (ECF No. 48, PageID #1676.) Not so. After opposing MTS's motion based on the Phase One order, Timken

39

presented an argument that genuine disputes of material fact preclude the entry of summary judgment on these claims.  (ECF No. 43, PageID #1242–43.)  Timken points to evidence in the record that MTS made representations early in the life of the project and the relationship of the parties regarding the ability to upgrade the NTL 5U that Timken maintains induced it to select MTS.  (*See, e.g.*, ECF No. 35-3, PageID #483; ECF No. 43-6, PageID #1301–03.)  According to Timken, MTS later admitted that it oversold its capabilities and products.  (ECF No. 44-14, PageID #1614.)  These statements may be puffery, reflect 20/20 hindsight, or constitute mere salesmanship of the sort even sophisticated purchasers encounter in the market.  Or they may be more.  But on summary judgment the Court must construe the record in favor of Timken as the non-moving party.  A finder of fact could credit these statements— whether fraudulently or negligently made—and return a verdict for Timken.

As a formal matter, if proved at trial, these facts would support Timken's position that MTS knowingly made false representations, or concealed material facts, with intent to induce reliance.  *See Micrel, Inc. v. TRW, Inc.*, 486 F.3d 866, 874 (6th Cir. 2007) (setting forth elements of fraudulent inducement under Ohio law); *see also Delman v. City of Cleveland Hts.*, 41 Ohio St.3d 1, 4, 534 N.E.2d 835, 838 (1989) (elements of negligent misrepresentation).

To resist this conclusion, MTS argues that its representations regarding the ability to upgrade the NTL 5U were true.  It points to testimony of Timken's corporate representative.  (ECF No. 35-3, PageID #483, #485.)  At best, however, that testimony is equivocal.  A jury may interpret it as MTS does, but the testimony also supports

40

Timken's position that the NTL 5U could not be upgraded as represented because adding actuators, though physically possible, would not function.  Such is the case as well with the other testimony on which MTS relies, which raises the same sorts of issues about the ability to upgrade the NTL 5U.  (*Id.*, PageID #482–83, #485.)  Which interpretation to credit rests with the jury, and on summary judgment the Court cannot say MTS is entitled to judgment as a matter of law.

Additionally, MTS maintains that the record lacks evidence it *knowingly* made any false statement.  But the record demonstrates that MTS quoted Timken two specific prices for upgrades that would add actuators and various components for hydraulic power supply and distribution.  (ECF No. 36-5, PageID #776; ECF No. 36-6, PageID #799; ECF No. 43-6, PageID #1304–05.)  Because MTS holds itself out as a sophisticated supplier of equipment of the type Timken sought, a jury could find that it knowingly made the representations at issue.

In reply, MTS argues that Timken chose not to upgrade the NTL 5U.  But that position has no bearing on why Timken entered into a relationship with MTS in the first place.  (*See* ECF No. 35-3, PageID #482.)  At bottom, a jury could find that MTS took liberties with its representations and, in doing so, knew what it was doing.  Perhaps MTS has the better of that argument, as it maintains in its lengthy reply on the issue.  Perhaps not.  Whatever the case, resolution of the parties' dispute on these claims presents questions of fact for a jury.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's motion for summary judgment and **DENIES** Plaintiff's motion for summary judgment.  Based on the foregoing analysis, the following claims remain: (1) fraudulent inducement, and (2) alternatively, negligent misrepresentation.

**SO ORDERED.**

Dated:  May 14, 2021

_____
J. Philip Calabrese
United States District Judge
Northern District of Ohio

42